IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **GEORGE ANIBOWEI** ) | Case No. 3:16-CV-3495-D |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **LORETTA LYNCH**, Attorney General ) | |
| of the United States, in her official capacity; ) | |
| ) | |
| **JAMES B. COMEY**, Director of the ) | |
| Federal Bureau of Investigation, ) | |
| in his official capacity; ) | |
| ) | |
| **CHRISTOPHER M. PIEHOTA**, ) | |
| Director of the Terrorist Screening ) | |
| Center; in his official capacity; ) | |
| ) | |
| **NICHOLAS RASMUSSEN**, ) | |
| Director of the National Counterterrorism ) | |
| Center, in his official capacity; ) | |
| ) | |
| **JEH JOHNSON**, Director of the ) | |
| Department of Homeland Security, in ) | |
| his official capacity; ) | |
| ) | |
| **R. GIL KERLIKOWSKE**, Commissioner ) | |
| of the United States Customs and Border ) | |
| Protection, in his official capacity; ) | |
| ) | |
| **PETER NEFFENGER**, Administrator of the ) | |
| United States Transportation Security ) | |
| Administration, in his official capacity; and, ) | |
| ) | |
| **SARAH R. SALDANA**, Director of United ) | |
| States Immigration and Customs ) | |
| Enforcement; in her official capacity; ) | |
| ) | |
| Defendants. ) | |

## FIRST AMENDED COMPLAINT

## NATURE OF THE ACTION

1. This is an action for declaratory and injunctive relief against officers or employees of agencies of the United States including officials or employees of the Department of Homeland Security and its components, Customs and Border Protection and Immigration and Customs Enforcement. On October 10, 2016, Plaintiff arrived at the Dallas/Fort Worth International Airport after a weekend trip to Canada. At his arrival gate to "receive" him were Officers of the United States Customs and Border Protection, who asked Plaintiff to accompany them to an interrogation room. At the interrogation room, the CBP Officers seized and detained Plaintiff's cell phone for "examination and copying". Plaintiff was not asked for his consent and was not presented with a search warrant. As a matter of fact, Plaintiff vehemently objected to the "examination and copying" of his cell phone without his consent or search warrant. Plaintiff challenges as a violation of the First and Fourth Amendments the detention of his cell phone and the review, copying, retention, and dissemination of its contents. Plaintiff also avers that the materials seized by the government contain confidential information and that Defendants' review, retention, and disclosure of that information intrudes on Plaintiff's rights protected by the First Amendment. Plaintiff seeks a declaratory judgment that the search and seizure violated the First and Fourth Amendments, and a Court Order requiring Defendants to return or destroy any seized data in their custody or control and to inform Plaintiff whether that data has been disclosed to

other agencies or individuals.

## Jurisdiction and Venue

1.         Under U.S. Const. Art. III §2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), *et seq.*, 5 U.S.C. § 702, 5 U.S.C. § 706, the United States Constitution, and federal common law.

   2. This action seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201  02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and pursuant to the general, legal, and equitable powers of this Court.

   3. This action also seeks damages pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1357.

   4. A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Northern District of Texas.

   5. Venue is proper under 42 U.S.C. § 1391(e) as to all Defendants because Defendants are officers or employees of agencies of the United States

sued in their official capacity and because this judicial district is where a substantial part of the events or omissions giving rise to the claims occurred.

## Parties

6.  Plaintiff George Anibowei is a United States Citizen. Plaintiff resides at 934 Colorado Drive, Allen, TX 75013. Plaintiff is a Texas licensed attorney, who is engaged in active and substantial practice of law with offices in Dallas, Texas. Plaintiff was licensed in Texas in 2002 and his Texas Bar Number is: 24036142. Although licensed in the State of Texas in 2002, Plaintiff has been an attorney since 1992, having been licensed in Nigeria before immigrating to the United States.

7.  Defendant Loretta Lynch is Attorney General of the United States. Defendant Lynch is being sued in her official capacity, only.[1]

8.  Defendant James B. Comey is Director of the Federal Bureau of Investigation ("FBI"). Defendant Comey is being sued in his official capacity, only.

9.  Defendant Christopher M. Piehota is Director of the Terrorist Screening Center ("TSC"). Defendant Piehota is being sued in his official capacity, only.

10. Defendant Nicholas Rasmussen is Director of the National

---

[1] For basis of suit against the four non-DHS Defendants, please see paragraph 30 of Plaintiff's First Amended Complaint.

Counterterrorism Center ("NCTC"). Defendant Rasmussen is being sued in his official capacity, only.

11. Defendant Jeh Johnson is Director of the Department of Homeland Security. Defendant Johnson is being sued in his official capacity, only.

12. Defendant R. Gil Kerlikowske is Commissioner of the United States Customs and Border Protection ("CBP"). Defendant Kerlikowske is being sued in his official capacity, only.

13. Defendant Peter Neffenger is Administrator of the United States Transportation Security Administration ("TSA"). Defendant Neffenger is being sued in his official capacity, only.

14. Defendant Sarah R. Saldana is Director of the United States Immigration and Customs Enforcement ("ICE"). Defendant Saldana is being sued in her official capacity, only.

## Factual Allegations

15. Sometime in September 2009, Plaintiff applied to the CBP for participation in the Global Entry Trusted Traveler Program administered by the CBP.

16. By correspondence dated November 1, 2012, the CBP approved Plaintiff's Application to participate in the Global Entry Trusted Traveler Program with Membership # 982902958.

17. The approval letter advises the Plaintiff to closely adhere to the program requirements as any violation of law or regulation may lead to revocation of program participation. After approximately three (3) years of active, uninterrupted and compliant participation by Plaintiff in the CBP Global Entry Trusted Traveler program, Plaintiff discovered to his greatest dismay, while returning from a trip abroad on May 12, 2015 and attempting to use the Global Entry Kiosk, that his Global Entry privileges had been revoked effective March 7, 2015. Significantly, the revocation was without any prior notice and/or opportunity to rebut any derogatory or adverse information.

18. As indicated above, on or about May 12, 2015, upon his reentry into the United States, Plaintiff was apprised by a CBP Global Entry Trusted Traveler kiosk at the Airport that his membership in the Global Entry Trusted Traveler program had been revoked on the ground that Plaintiff does not meet the program eligibility requirements.

19. Thereafter, Plaintiff was singled out for secondary inspection by agents of CBP and subjected to needless interrogation and rigorous search of his person and luggage.

20. Copy of the letter of revocation dated March 7, 2015, is herewith attached and incorporated herein by reference. As the revocation letter shows, the ground for revocation is not only vague and ambiguous but very confusing

21. Most importantly, Plaintiff is not aware and do not know of any circumstance that may have rendered him ineligible for participation in the global entry program. Plaintiff did not provide any false or incomplete information on his global entry application. Plaintiff does not have any conviction for any criminal offense and there are no pending criminal charges against Plaintiff. Plaintiff has never violated any customs, immigration or agriculture regulations or laws in any country. Plaintiff is not subject to inadmissibility to the United States under immigrations laws. Plaintiff has never received any criminal pardon from any country. To the best of Plaintiff's knowledge, Plaintiff does not know of any circumstances that has made him become a high risk and thereby ineligible for participation in the program. Significantly and as indicated above, to the extent that there is any adverse information against Plaintiff which has rendered him ineligible for participation in the program, Plaintiff was not provided with any notice thereof and/or an opportunity to rebut any such disqualifying and/or adverse information before his privileges were revoked

22. Even before and Subsequent to the revocation of his global entry privileges, on virtually each and every occasion during which Plaintiff re-entered the United States after having traveled abroad, Plaintiff has been referred for secondary inspection, detained, and questioned by agents of CBP with his luggage and carry-on bag subjected to very thorough and rigorous search, much to the

detriment, inconvenience, harassment and humiliation of Plaintiff. Plaintiff was also occasionally subjected to secondary security screening while leaving the United States, and sometimes while outside of the United States during the course of international travel

23. On one occasion, Plaintiff and his teenage son, who shares the same name as the Plaintiff, were prevented from boarding a United Airlines flight from Houston to Lagos, Nigeria and escorted to an interrogation room, detained and questioned for approximately two hours consequently resulting in a flight delay of approximately two hours. Plaintiff did not know that he had anything to do with the two hour flight delay until a manager from United Airlines walked into the interrogation room and asked one of the officers if it was okay to begin boarding only for the officer to respond that it was okay because they were almost done with the Plaintiff.

24. On another occasion, while travelling on Air Ethiopia via Canada to Zimbabwe on vacation, Plaintiff was singled out for secondary inspection, detained and questioned for almost five hours by officers of the Canada Border Services Agency (CBSA) at the instance of the United States CBP. It is important to emphasize that on this occasion, Plaintiff missed his international flight and because the flight was not a daily flight, Plaintiff was stranded in Toronto, Ontario, Canada for two days and was compelled to incur hotel bills of at least $400.00. To make

matters worse, despite the immigration induced delay resulting in his missed flight, Plaintiff was compelled to pay a whopping re-booking fee of $500.00 to continue on his journey to Zimbabwe. It is pertinent to point out that as soon as the Canadian authorities realize that Plaintiff will miss his connecting flight to Addis Ababa, Ethiopia, they directed the airline to locate his checked in luggage and surrender the luggage to them before taking off.

25. These are only a few of the various instances in which Plaintiff was subjected to secondary inspection and/or detained and questioned during the course of international travel.

26. Importantly, following the Revocation of his Global Entry Privilege, Plaintiff requested reconsideration of his Application into the Global Entry Trusted Traveler program and by correspondence from the CBP Ombudsman dated March 11, 2016, the CBP Ombudsman acknowledged receipt of Plaintiff's request for reconsideration of his application into the Global Entry Trusted Traveler program, and re-affirmed that Plaintiff does not meet the eligibility requirements for a trusted traveler program for the reasons originally provided to Plaintiff in the notice of revocation (which as previously indicated was because Plaintiff "…*do not meet the eligibility requirements for a Trusted Traveler program*").

27. Additionally, Plaintiff filed a Redress Request under #2232473 with the CBP on the Department of Homeland Security – TRIP Website and provided

all relevant information requested therein.

28.     By correspondence dated June 30, 2016 from Deborah O. Moore, Director, DHS Traveler Redress Inquiry Program Programs in response to Plaintiff having submitted a Department of Homeland Security – TRIP Website Traveler Inquiry Form, Plaintiff was advised that "DHS has researched and completed our review of your case. Security Procedures and legal concerns mandate that we can neither confirm nor deny any information about you which may be within federal watch lists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification"

29.     Notwithstanding the reassuring letter from the DHS TRIP Redress Program Director, on October 6, 2016 Plaintiff travelled to Canada for vacation. Upon arrival in Canada, Plaintiff was again singled out for secondary inspection, detained and questioned for almost two hours by the Canadian Immigration and Border Patrol authorities before he was granted admission into Canada. Upon inquiry, Plaintiff was informed by the Canadian authorities that he had been singled out at the instance of their United States counterparts

30.     As the attached DHS TRIP correspondence of June 30, 2016 indicates, certain passenger complaints, like those of the instant Plaintiff,

actually have some connection to the Terrorist Watch list. In September 2003, the United States Attorney General established the Terrorist Screening Center (TSC) to consolidate the government's approach to terrorism screening. The TSC is administered by the FBI. The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list"). TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list related screening. TSC sends records from its terrorist watch list to other government agencies that in turn use those records to identify suspected terrorists. For example, applicable TSC records are provided to TSA for use by airlines in pre-screening passengers and to CBP for use in screening travelers entering the United States. Thus, while it is the front-line agencies like the TSA and CBP that carry out the screening function, it is the TSC that maintains and controls the database of suspected terrorists. In the context of air travel, when individuals make airline reservations and check in at airports, the front-line screening agency, like TSA and CBP, conducts a name-based search of the individual to determine whether he or she is on a watch list. Although TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the database of suspected terrorists. The NCTC and the FBI are the two government entities that are

primarily responsible for "nominating" individuals for inclusion in the terrorist watch list. Besides, Plaintiff has every reason to believe that the information obtained from his cell phone has been disclosed or disseminated to other agencies, organizations, individuals, or foreign governments, including but not limited to the other four non-DHS Defendants. It is for these reasons that in addition to the DHS Defendants, the United States Attorney General, the Director of the Federal Bureau of Investigation, the Director of the Terrorist Screening Center and the Director of the National Counterterrorism Center have been made parties to this lawsuit.

30. On October 10, 2016, Plaintiff arrived at the Toronto International airport to board his flight to the United States. While going through the US Customs and Border Protection formalities, Plaintiff was yet again referred for secondary inspection in Canada before he was eventually allowed to board his return flight to the Dallas/Fort Worth International Airport

### Seizure of Plaintiff's Electronic Device

31. As indicated above, on October 10, 2016, after a short vacation in Canada, Plaintiff arrived at the Dallas/Fort Worth International Airport on board American Airlines Flight No. 2609.

32. Upon arrival at the gate and as passengers were getting ready to disembark, the airline crew directed all passengers to return to their respective

seats as officers of DHS were at the gate to remove a passenger and that it was important they did so in an orderly manner.

33. Almost immediately all passengers including the Plaintiff returned to their assigned seats, one of the crew members walked up to the Plaintiff's seat and requested some identification. As soon as Plaintiff tendered his passport, he was informed that the CBP officers were actually at the gate for the Plaintiff. Plaintiff was then instructed to pick up his hand luggage and accompany the crew member to the gate of the aircraft. The Plaintiff readily complied with the instruction and followed the crew member to the gate.

34. Upon exiting the Plane, Plaintiff was accosted by armed officers of the CBP who stated that they were with the Department of Homeland Security and requested that the Plaintiff accompany them. Despite repeated requests, the two agents did not explain the reason or the authority for detaining Plaintiff. Instead, they ordered the Plaintiff to place his cell phone in his pocket for "officer safety" and proceeded to escort the Plaintiff like a common criminal through at least three terminals before arriving at their final destination, which is an interrogation room in Terminal D of the Dallas/Fort Worth International Airport

35. At the interrogation room, the agents ordered the Plaintiff to empty and place all the content in his pocket on a table. The Plaintiff placed all the contents of his pocket on the table as ordered. Thereafter, one of the agents took

Plaintiff's cell phone and directed him to be seated and wait. When the agent returned a short time later, she was no longer in possession of Plaintiff's cellular phone. When Plaintiff asked for his cell phone, he was informed that his cell phone was being detained for "examination and copying". Plaintiff was not asked for his consent and was not presented with a search warrant. Nor was he provided with any explanation of the purpose of the detention and copying. As authority for taking his cell phone for examination and copying, he was simply handed a two paged document entitled: Inspection of Electronic Device, copy of which is herewith attached and incorporated herein by reference.

36. Thereafter, the agents continued to detain the Plaintiff and questioned the Plaintiff for approximately two hours. They questioned Plaintiff regarding his background, personal life and purpose of his trip to Canada. Significantly, Plaintiff was asked no questions relating to border control, customs, trade, immigration, or terrorism, and at no point did the agents suggest that plaintiff had broken the law or that his cell phone contained any illegal material. Plaintiff answered their questions truthfully and to the best of his ability.

37. When Plaintiff was finally allowed to leave, they returned his cell Phone and informed the Plaintiff that its contents have been copied for examination. However, they did not indicate what information had been copied from his cell phone, what agencies or individuals would have access to any copies

made, and whether any such copies would ultimately be destroyed or stored.

38. Subsequent to the filing of this lawsuit and more specifically, on February 12, 2017, Plaintiff embarked on an international travel to Nigeria. On February 27, 2017, Plaintiff arrived at the Dallas/Fort Worth International airport on board Lufthansa Flight No. 438. While going through the US Customs and Border Protection formalities and as the attached arrival record shows, Plaintiff was yet again referred for secondary inspection. During the secondary inspection, Plaintiff was again detained and questioned by agents of CBP with his cell phone, luggage and carry-on bag subjected to very thorough and rigorous search, much to the detriment, inconvenience, harassment and humiliation of Plaintiff. While undergoing secondary inspection, the CBP agent ordered the Plaintiff to empty and place all the content in his pocket on a table. As ordered, The Plaintiff placed all the contents of his pocket, including his cell phone, on the table. Thereafter, the agent painstakingly subjected Plaintiff's cell phone to rigorous examination and went through Plaintiff's text messages and emails. Meanwhile, Plaintiff's cell phone contained private and sensitive materials which he did not intend to expose to view by others without his consent. The private and sensitive materials included personal and private information as well as confidential and privileged information concerning his work on behalf of his clients which he chose to record or store in his cell phone. As in the past, Plaintiff was not asked for his consent

and was not presented with a search warrant. Nor was he provided with any explanation of the purpose of the painstaking examination of his cell phone.

39. Thereafter, the agents continued to detain the Plaintiff and questioned the Plaintiff for approximately three hours. Again is in the past, they questioned Plaintiff regarding his background, personal life and purpose of his trip to Nigeria. Significantly, Plaintiff was asked no questions relating to border control, customs, trade, immigration, or terrorism, and at no point did the agents suggest that plaintiff had broken the law or that his cell phone contained any illegal material. Plaintiff answered their questions truthfully and to the best of his ability.

40. Based on past experiences and especially considering that subsequent to the filing of this lawsuit, Plaintiff was again referred for secondary inspection, detained and questioned for approximately three hours by agents of CBP with his cell phone, luggage and carry-on bag subjected to very thorough and rigorous search, much to the detriment, inconvenience, harassment and humiliation of Plaintiff, Plaintiff has every reason to believe that in the future, Defendants will most likely repeat their illegal acts and conduct against him.

### The Search, Retention, and Dissemination of the Contents of Plaintiff's Electronic Device

40. Formal policy statements issued in 2009 by both CBP and ICE purport to authorize border agents to detain an international traveler's "electronic devices," broadly defined as devices which "contain information." CBP Directive

No. 3340-049, "Border Search of Electronic Devices Containing Information" (Aug. 20, 2009); ICE Directive No. 7-6.1, "Border Searches of Electronic Devices" (Aug. 18, 2009). These policies permit government officials to read and/or analyze the contents of such devices without any basis for suspicion of wrongdoing. This authority extends to any information which they may discover, without regard to whether that information is personal, confidential, or even privileged.

41. Both CBP and ICE policies permit the detention of seized items after the traveler has left the border for purpose of further reading or analysis. The policies also authorize the sharing of a traveler's devices or information obtained from those devices with other government agencies or private parties for the purpose of obtaining assistance in the search and analysis of their contents.

42. Although the CBP and ICE Policies purport to limit retention of information gleaned from a traveler's electronic devices, retention is permitted whenever the information is deemed "relevant" to immigrations, customs, or any other law enforcement matter, and any retained information may be shared with federal, state, local, and foreign law enforcement agencies.

43. Plaintiff alleges on information and belief that agents of Defendants, acting pursuant to established CBP and ICE policies, reviewed and copied the contents of his electronic devices, that this information has been retained by

Defendants, and that it has been disclosed to and retained by other government agencies.

44. Plaintiff's cell phone contained private and sensitive materials which he did not intend to expose to view by others without his consent. This included personal and private information as well as confidential and privileged information concerning his work on behalf of his clients which he chose to record or store in his cell phone.

45. The information stored on the cell phone taken from the Plaintiff included his personal e-mail communications covering a period of several years, including confidential communications sent to and from his clients as well as messages to family members and friends and messages concerning attorney-client related matters, records of his personal finances, work in progress, and passwords allowing access to his bank account, his workplace computer, and secure communications websites.

46. At no point during the seizure, transfer, search, and detention of Plaintiff's cell phone or the copying, dissemination, and retention of information derived from them did the government have reasonable suspicion to believe that Plaintiff's devices contained any material constituting a violation any law respecting customs, immigration, or terrorism.

## FIRST CAUSE OF ACTION

47. The detention and search of Plaintiff's electronic devices, and

Defendants' continued retention and dissemination of the information they contained, are unreasonable and violate the Fourth Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION

48.  The detention and search of Plaintiff's electronic devices, and Defendants' continued retention and dissemination of the information they contained, violate the First Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the detention and seizure of Plaintiff's cell phone and the review, copying, retention, and dissemination of its contents without reasonable suspicion violates the Fourth and First Amendments to the United States Constitution.

B. Enter preliminary and permanent injunctions requiring Defendants to return to Plaintiff all information in their possession, custody or control obtained from Plaintiff's cell phone and, to the extent the information cannot be returned, to expunge or otherwise destroy that information.

C. Enter preliminary and permanent injunctions requiring Defendants to disclose to Plaintiff:

(1) whether any information obtained from Plaintiff's cell phone has been

disclosed or disseminated to any other agencies, organizations, individuals, or foreign governments, including but not limited to those agencies from which CBP and/or ICE sought technical assistance in accessing the information;

(2) when and in what form any such disclosure or dissemination occurred; and (3) the specific data or information which was disclosed or disseminated, and to whom.

D. Award Plaintiff reasonable attorneys' fees and costs.

E. Grant any other relief the Court deems appropriate.

Dated: March 14, 2017

                        Respectfully submitted,

                        By: */S/George Anibowei*
                        George Anibowei
                        Texas Bar No. 24036142
                        The Law Office of George Anibowei, P.C.
                        6060 N. Central Expressway, Ste. 560
                        Dallas, Texas 75206
                        Telephone No: (214) 800-3463
                        Facsimile No: (214) 800-3464
                        Email: ganibowe@yahoo.com
                        **ATTORNEY FOR PLAINTIFF,**
                        **GEORGE ANIBOWEI**